Filed 1/28/26 (unmodified opinion attached)

CERTIFIED <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DEPARTMENT OF WATER RESOURCES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al.,<br><br>Defendants and Appellants. | C100552<br><br>(Super. Ct. No. 34-2020-00283112-CU-MC-GDS) |
| SIERRA CLUB et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>DEPARTMENT OF WATER RESOURCES,<br><br>Defendant and Respondent;<br><br>THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al.,<br><br>Real Party in Interest and Appellants. | (Super. Ct. No. 34-2020-80003517-CU-WM-GDS)<br><br>MODIFICATION OF OPINION AND DENIAL OF PETITIONS FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

[*]    Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II.

1

THE COURT:

Appellant Department of Water Resources filed a petition for rehearing with this court. It is hereby ordered that the petition for rehearing is denied.

It is also ordered that the opinion filed herein on December 31, 2025, be modified as follows:

1.    On page 12, the second sentence and citation of the second paragraph reads, "The Feather River Project proposed a multi-purpose dam and reservoir on the Feather River near Oroville (complete with a hydroelectric power plant and afterbay); a "Delta Cross Channel" to carry water from the Sacramento River to the Delta; an aqueduct to transport water from the Delta to Alameda and Santa Clara Counties; and another aqueduct to transport water from the Delta to the San Joaquin Valley and Southern California. (O'Connor, at pp. B4-B5.)" and is replaced to read as follows:

> The Feather River Project proposed a multi-purpose dam and reservoir on the Feather River near Oroville (complete with a hydroelectric power plant and afterbay); a "Delta Cross Channel" to carry water from the Sacramento River to the westerly channels of the San Joaquin Delta; an aqueduct to transport water from the Delta to Alameda and Santa Clara Counties; and another aqueduct to transport water from the Delta to the San Joaquin Valley and Southern California. (O'Connor, at pp. B4-B5; see 1955 Report, *infra*, p. 4.)

2.    On page 18, the first sentence of the second paragraph reads, "To facilitate exports from the Delta, the original Feather River Project proposed the "Delta Cross Channel" facility, which was designed to "convey water flowing down the Sacramento River to the westerly channels of the San Joaquin Delta" and is replaced to include the citation and read as follows:

> To facilitate exports from the Delta, the original Feather River Project proposed the "Delta Cross Channel" facility, which was designed to "convey water flowing down the Sacramento River to the westerly channels of the San Joaquin Delta." (1955 Report, *supra*, p. 4.)

3.   On page 18, the third sentence of the third paragraph reads, "At the time, DWR "had not developed a construction plan for [any] Delta facilities" and is replaced to include the citation and read as follows:

> At the time, DWR "had not developed a construction plan for [any] Delta facilities." (O'Connor, *supra*, at p. B14.)

4.   On page 20, the first full paragraph reads, "After the Peripheral Canal's defeat, DWR temporarily shifted its focus back to "through-Delta" water transfer facilities, investigating options such as the "New Hope Cross Channel-South Delta Intake Channel," "New Hope Cross Channel-Enlarged Clifton Court Forebay," and "Enlarged North Delta Channels-Enlarged Clifton Court Forebay" and is replaced to include the citation and read as follows:

> After the Peripheral Canal's defeat, DWR temporarily shifted its focus back to "through-Delta" water transfer facilities, investigating options such as the "New Hope Cross Channel-South Delta Intake Channel," "New Hope Cross Channel-Enlarged Clifton Court Forebay," and "Enlarged North Delta Channels-Enlarged Clifton Court Forebay." (O'Connor, *supra*, at p. C17.)

5.   On page 20, the first sentence of the second paragraph reads, "In 2006, DWR began working on a proposal known as the Bay Delta Conservation Plan, which consisted of a new isolated conveyance facility plus a long-term habitat conservation plan for the greater Delta" and is replaced to read as follows:

> In 2006, DWR began working on a proposal known as the Bay Delta Conservation Plan, which included a new isolated conveyance facility as part of a long-term habitat conservation plan for the greater Delta.

6.   On page 21, the second sentence and citation of the first full paragraph reads, "Although the allegations vary, in general, the lawsuits alleged that [DWR] violated

3

CEQA by failing to adequately and accurately describe the project; defining project objectives too narrowly; using an improper baseline; piecemealing the environmental analysis; failing to adequately identify, analyze, and mitigate the project's impacts (especially to water quality and hydrology); failing to consider a reasonable range of alternatives; failing to recirculate the final EIR; failing to adequately consult with stakeholders and meaningly respond to public comments; and adopting findings that are not supported by substantial evidence. [The plaintiffs] also alleged violations of the Sacramento-San Joaquin Delta Reform Act of 2009 (§ 85000 et seq.), the public trust doctrine, and the California Endangered Species Act. (Fish & G. Code, § 2050 et seq.)" and is replaced to read as follows:

> "Although the allegations vary, in general, the lawsuits alleged that [DWR] violated CEQA by failing to adequately and accurately describe the project; defining project objectives too narrowly; using an improper baseline; piecemealing the environmental analysis; failing to adequately identify, analyze, and mitigate the project's impacts (especially to water quality and hydrology); failing to consider a reasonable range of alternatives; failing to recirculate the final EIR; failing to adequately consult with stakeholders and meaningfully respond to public comments; and adopting findings that are not supported by substantial evidence. [The plaintiffs] also alleged violations of the Sacramento-San Joaquin Delta Reform Act of 2009 (§ 85000 et seq.), the public trust doctrine, and the California Endangered Species Act. (Fish & G. Code, § 2050 et seq.)."

7. On page 22, the first sentence of the second full paragraph reads, "In connection with the proposed Conveyance Project, DWR entered into an (amended and restated) joint exercise powers agreement with several state water contractors to manage the design and construction of the Conveyance Project" and is replaced to read as follows:

> In connection with the proposed Conveyance Project, DWR entered into an (amended and restated) agreement with a joint powers authority formed by several state water contractors to manage the design and construction of the Conveyance Project.

4

8.     On page 26, the third and fourth sentence of the third paragraph reads, "Sierra Club, moved for a new trial and for reconsideration of the January 2022 ruling.  The trial court denied the new trial motion, granted reconsideration, and reaffirmed its ruling in favor of DWR" and is replaced to correct punctuation and read as follows:

> Sierra Club moved for a new trial and for reconsideration of the January 2022 ruling.  The trial court denied the new trial motion, granted reconsideration, and reaffirmed its ruling in favor of DWR.

9.     On page 26, the first sentence of the fourth paragraph reads, "North Coast Rivers Alliance, and DWR subsequently filed cross-motions for summary judgment on the affirmative defenses related to alleged violations of the Delta Reform Act and public trust doctrine" and is replaced to correct punctuation and read as follows:

> North Coast Rivers Alliance and DWR subsequently filed cross-motions for summary judgment on the affirmative defenses related to alleged violations of the Delta Reform Act and public trust doctrine.

10.    On page 27, the first sentence of the first full paragraph reads, "The remaining validation issues proceeded to a bench trial conducted from May 15, 2023, through May 8, 2023," and is replaced to read, "The remaining validation issues proceeded to a bench trial conducted from May 15, 2023, through May 18, 2023."

11.    On page 27, the first sentence of the third full paragraph reads, "Respondents Sierra Club, has filed a request for judicial notice of select pages of the December 21, 2023, Executive Summary and final EIR for the Conveyance Project" and is replaced to read as follows:

> Sierra Club has filed a request for judicial notice of select pages of the December 21, 2023, Executive Summary and final EIR for the Conveyance Project.

5

12.    On page 35, the second sentence of the second paragraph reads, "They include the Oroville Dam (with hydroelectric power plant and afterbay), a "Delta Cross Channel" to carry water from the Sacramento River to the Delta, the San Luis Reservoir and Forebay, Buena Vista Forebay, Quail Lake Afterbay, various pumping stations, and conveyance systems (including aqueducts and canals) to transport water from the Delta to the Bay Area and Southern California" and is replaced to read as follows:

> They include the Oroville Dam (with hydroelectric power plant and afterbay), a "Delta Cross Channel," the San Luis Reservoir and Forebay, Buena Vista Forebay, Quail Lake Afterbay, various pumping stations, and conveyance systems (including aqueducts and canals) to transport water from the Delta to the Bay Area and Southern California.

13.    On page 39, the second sentence of the first full paragraph reads, "As one of the original features of the Feather River Project, the Delta Cross Channel involved a proposal to excavate a new channel from the Sacramento River to Georgiana Slough, along with dredging existing channels, to transport water naturally north to south, from the Sacramento River to the San Joaquin River delta" and is replaced to include the citation and read as follows:

> As one of the original features of the Feather River Project, the Delta Cross Channel involved a proposal to excavate a new channel from the Sacramento River to Georgiana Slough, along with dredging existing channels, to transport water, north to south, from the Sacramento River to the westerly channels of the San Joaquin River Delta.  (1955 Report, *supra*, p. 4.)

14.    On page 39, the third sentence of the first full paragraph reads, "The Delta Cross Channel never contemplated a wholesale diversion of water around or under the Delta" and is replaced to read, "The Delta Cross Channel never contemplated a wholesale diversion of water around or under the Delta estuary."

6

15. On page 41, the first full paragraph is omitted, and the first and second sentences are modified to read as follows:

> In addition, aside from the overly broad definition of the Delta Program, section 805 of the Bond Resolutions provides that DWR "shall charge and collect amounts under the Water Supply Contracts sufficient to return the costs of the Delta Program for which Bonds have been authenticated and delivered . . . ." A judgment validating this language could be construed as adjudicating that DWR has the contractual right to charge state water contractors for Delta Program capital costs.

This modification does not change the judgment.

FOR THE COURT:

_____\s_____
Duarte, Acting P. J

_____\s_____
Renner, J.

_____\s_____
Krause, J.

7

Filed 12/31/25 (unmodified opinion)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>\*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DEPARTMENT OF WATER RESOURCES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>THE METROPOLITAN WATER DISTRICT<br>OF SOUTHERN CALIFORNIA et al.,<br><br>Defendants and Appellants. | C100552<br><br>(Super. Ct. No. 34-2020-00283112-CU-MC-GDS) |
| SIERRA CLUB et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>DEPARTMENT OF WATER RESOURCES,<br><br>Defendant and Respondent;<br><br>THE METROPOLITAN WATER DISTRICT<br>OF SOUTHERN CALIFORNIA et al.,<br><br>Real Party in Interest and Appellants. | (Super. Ct. No. 34-2020-80003517-CU-WM-GDS) |

---

\*      Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II.

1

APPEAL from a judgment of the Superior Court of Sacramento County, Kenneth C. Mennemeier, Jr., Judge. Affirmed.

Ann K. B. Carroll and Christopher Martin, General Counsel; Rob Bonta, Attorney General, Evan Eickmeyer, Supervising Deputy Attorney General, Daniel M. Fuchs, and Matthew J. Goldman, Deputy Attorneys General; Orrick, Herrington & Sutcliff, Michael Weed, and Stanley J. Dirks for Plaintiff, Defendant, and Appellant Department of Water Resources.

E. Robert Wright for Plaintiffs, Defendants, and Appellants Sierra Club California, Restore the Delta, and Planning and Conservation League.

John Buse and Aruna M. Prabhala for Plaintiffs, Defendants, and Appellants Center for Biological Diversity and Friends of Stone Lakes National Wildlife Refuge.

Law Office of Adam Keats, Adam Keats for Plaintiffs, Defendants, and Appellants, Planning and Conservation League, and Restore the Delta.

Best Best & Krieger, Christopher Pisano, Miles Krieger, and Joseph Byrne for Plaintiff, Defendants, and Appellant Santa Clarita Valley Water Agency.

Freeman Firm, Thomas H. Keeling for Plaintiffs, Defendants, and Appellants County of San Joaquin, County of Contra Costa, Contra Costa County Water Agency, County of Solano, County of Yolo, County of Plumas, Plumas County Flood Control and Water Conservation District, and County of Butte.

Redwine and Sherill, Steven B. Abbott for Plaintiff, Defendants, and Appellant Coachella Valley Water District.

Brunick, McElhaney & and Kennedy, William J. Brunick and Leland P. McElhaney for Plaintiff, Defendant, and Appellant Mojave Water Agency.

Varner & Brandt, Scott R. Heil for Plaintiff, Defendants, and Appellant San Bernardino Valley Municipal Water District.

Law Offices of Stephan C. Volker, Stephan C. Volker, Stephanie L. Clark, and Jamey M.B. Volker for Plaintiffs, Defendants, and Appellants North Coast Rivers

2

Alliance, Winneman Wintu Tribe, Institute for Fisheries Resources, Pacific Coast Federation of Fishermen's Association, and San Francisco Crab Boat Owners Association.

Law Office of Roger B. Moore, Roger B. Moore for Plaintiffs, Defendants, and Appellants County of San Joaquin, County of Contra Costa, Contra Costa County Water Agency, County of Solano, County of Yolo, County of Plumas, Plumas County Flood Control Water Conservation District, and County of Butte.

Musick Peeler & Garrett, Cheryl A. Orr for Plaintiff, Defendant, and Appellant Tulare Lake Basin Water Storage District.

Kirnpreet Kaur, County Counsel for Plaintiff, Defendant, and Appellant County of San Joaquin.

Thomas L. Geiger and Stephen M. Siproth, County Counsel for Plaintiffs, Defendants, and Appellants for County of Contra Costa and Contra Costa County Water Agency.

Bernadette S. Curry and Carolyn Blacklock, County Counsel for Plaintiff, Defendant, and Appellant County of Solano.

Philip J. Pogledich and Eric May, County Counsel for Plaintiff, Defendant, and Appellant County of Yolo.

Bradley J. Stephens, County Counsel for Plaintiff, Defendant, and Appellant County of Butte.

Joshua M. Brechtel and Sara G. James, County Counsel for Plaintiffs, Defendants, and Appellants County of Plumas and Plumas County Flood Control and Water Conservation District.

Law Office of Mark A. Pruner, Mark A. Pruner for Plaintiff, Defendant, and Appellant Clarksburg Fire Protection District.

Marcia Scully, Robert C. Horton, and Bryan M. Otake; Atkins, Andelson, Loya, Rudd & Romo, David D. Boyer, and Bryan M. Wheeler; for Defendant, Appellant,

Respondent and Real Party In Interest Metropolitan Water District of Southern California.

Somach Simmons & Dunn, Aaron A. Ferguson, Kelly M. Taber, Michelle E. Chester, Ellen M. Moskal, and Louinda V. Lacey for Defendants and Respondents County of Sacramento, Sacramento County Water Agency, and the City of Yuba City.

Timothy A. Bittle, Jonathan M. Coupal, Laura E. Dougherty, and Amy C. Sparrow for Defendant and Respondent Howard Jarvis Taxpayer Association.

Ruddell, Stanton, Bixler, Mauritson & Evans, Aubrey Mauritson, and Josh T. Fox for Defendants, Appellants, and Respondents Tulare Lake Basin Water Storage and Oak Flat Water District.

Young Wooldridge, Steven M. Torigiani and Brett A. Stroud for Defendants and Respondents Wheeler Ridge-Maricopa Storage District, Semitropic Water Storage District, Semitropic Improvement District of Semitropic Water Storage District, Buttonwillow Improvement District of Semitropic Water Storage District, and Pond-Poso Improvement District of Semitropic Water Storage District.

Klein DeNatale Goldner, Joseph D. Hughes for Defendants and Respondents Belridge Water Storage, Berrenda Mesa Water District, Lost Hills Water District, and West Kern Water District.

McMurtrey, Hartsock, Worth & St. Lawrence, Isaac L. St. Lawrence for Defendants and Respondents Buena Vista Water Storage District, Henry Miller Water District, and Cawelo Water District.

Richard L. Iger for Defendant and Respondent Kern Delta Water District.

Nossaman, Paul S. Weiland and Benjamin Z. Rubin for Defendant and Respondent Kern County Water Agency.

Belden Blaine Raytis, Daniel N. Raytis for Defendant and Respondent Rosedale Rio-Bravo Water Storage District.

4

LeBeau Thelen, Robert G. Kuhs for Defendant and Respondent Tehachapi-Cummings County Water District.

Diane Freeman, Ammet Nagra, Thomas Y. Lin, Willie Barrera, and Risé A. Donlon, County Counsel; Lozano Smith, Laurie Avedisian-Favini, Quentin C. Cedar, and Nisha K. Dale; for Real Party in Interest and Appellant County of Kings.

In this consolidated proceeding, the Department of Water Resources (DWR) seeks to validate its authority to issue revenue bonds for the planning, acquisition, and construction of the "Delta Program," defined as "facilities for the conveyance of water in, about and through the Sacramento-San Joaquin Delta." As the legal basis for validation, DWR relies on Water Code[1] section 11260, which authorized DWR to build and operate the "Feather River Project" as the initial component of the State Water Project. The features of the Feather River Project, as originally authorized, are not described in section 11260. Instead, the statute identified the project by reference to three reports from the 1950's. (*Ibid.*) The statute also authorized DWR to make "further modifications" to the project. (*Ibid.*) In seeking validation of the bonds, DWR asks us to sanction the Delta Program as a "further modification" of the Feather River Project under section 11260.

The respondents in this appeal include environmental groups, state water contractors, a taxpayer association, public agencies, and other parties (collectively, respondents) opposed to validation of the bonds.[2] Respondents filed a writ petition and

---

[1]    Undesignated section references are to the Water Code.

[2]    In addition to the cross-appealing parties described below, the respondents include:  Howard Jarvis Taxpayers Association, County of Sacramento, Sacramento County Water Agency, City of Yuba City, Clarksburg Fire Protection District, Oak Flat Water District, and the following "member units" of the Kern County Water Agency:  Wheeler Ridge-Maricopa Water Storage District, Semitropic Water Storage District (and

5

asserted affirmative defenses challenging DWR's approval of the bonds based on its alleged failure to comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code § 21000 et seq.) and other laws.

The trial court entered judgment denying both the CEQA petition and DWR's complaint for validation. The court found that DWR exceeded its authority under section 11260 when it approved the bonds because the definition of the Delta Program is too vague and uncertain to ascertain whether it qualifies as a "further modification" of the Feather River Project. As a result, the trial court concluded that DWR was not authorized to adopt the subject bond resolutions.

DWR and several supporting state water contractors (Metropolitan Water District of Southern California, Coachella Valley Water District, Mojave Water Agency, San Bernardino Valley Municipal Water District, and Santa Clarita Valley Water Agency)[3] appeal from the portion of the judgment denying validation, arguing, among other things, that the trial court's decision is based on an erroneous interpretation of the bond resolutions.

Respondents and cross-appellants Sierra Club, et al.,[4] appeal from the portion of the judgment denying the CEQA petition and granting summary adjudication in DWR's

---

its Semitropic, Buttonwillow, and Pond Poso Improvement Districts), Belridge Water Storage District, Berrenda Mesa Water District, Lost Hills Water District, West Kern Water District, Buena Vista Water Storage District, Henry Miller Water District, Cawelo Water District, Kern Delta Water District, Rosedale-Rio Bravo Water Storage District, and Tehachapi-Cummings County Water District.

[3] For ease of reference, we refer to DWR and the supporting state water contractors collectively as appellants.

[4] The cross-appealing respondents consist of the Sierra Club, Center for Biological Diversity, Planning and Conservation League, Restore the Delta, and Friends of Stone Lakes National Wildlife Refuge (collectively, Sierra Club); County of San Joaquin, County of Contra Costa, Contra Costa County Water Agency, County of Solano, County of Yolo, County of Butte, County of Plumas, and Plumas County Flood Control and Water Conservation District (collectively, the Public Agencies); North Coast Rivers

favor on affirmative defenses alleging violations of CEQA, the Sacramento-San Joaquin Delta Reform Act of 2009 (the Delta Reform Act) (§ 85000 et seq.), and the public trust doctrine.

We agree with the trial court that the contours of the Delta Program are too vague to support the requested validation judgment as a modification of the Feather River Project. We therefore affirm the judgment denying validation.

FACTUAL AND LEGAL BACKGROUND

A.      *History of the State Water Project*

"The problems surrounding California's water supply are well documented in California jurisprudence. The story is one of ' "uneven distribution of water resources" by region and season.' [Citation.] Precipitation varies widely from year to year, most of the precipitation occurs in the winter while demand is highest in the summer, and most of the rain and snow falls in the north while the highest demand for water arises in the south." (*Planning & Conservation League v. Department of Water Resources* (2024) 98 Cal.App.5th 726, 739-740 (*Planning & Conservation*).)

To address this maldistribution problem, beginning in the early 1920's state officials began studying the concept of a statewide water development project. (*Ivanhoe Irrigation Dist. v. All Parties & Persons* (1957) 47 Cal.2d 597, 614, reversed by *Ivanhoe v. McCracken* (1958) 357 U.S. 275, 293.) These studies culminated in a 1931 report outlining a coordinated "State Water Plan" for the conservation, development, and utilization of water resources. (Stats. 1929, ch. 832, § 1, pp. 1761-1762; Stats. 1941, ch. 1185, §§1, 2, p. 2943; Stats. 1943, ch. 368, pp. 1604-1742.) Two years later, the Legislature passed the Central Valley Project Act of 1933 (the CVP Act). (Stats. 1933,

---

Alliance, Winnemem Wintu Tribe, Institute for Fisheries Resources, Pacific Coast Federation of Fisherman's Associations, and San Francisco Crab Boat Owners Association (collectively, North Coast Rivers Alliance); and Tulare Lake Basin Water Storage District and County of Kings (collectively, Tulare Lake).

7

ch. 1042, p. 2643 et seq.)  After its passage, the CVP Act was approved by the voters in a special referendum election.

### 1. *Enactment of the CVP Act*

Section 1 of the CVP Act declared that "the public interest, welfare, convenience and necessity require the construction in the manner herein provided of a system of works for the conservation, development, storage, distribution, and utilization of water, with incidental generation, transmission, and distribution of electrical energy which system of works is hereby designated as the Central Valley Project, and is hereby specifically approved and authorized."  (Stats. 1933, ch. 1042, § 1, pp. 2643-2644.)  Section 3 of the act provided that "[t]he construction of said Central Valley Project is, and is hereby declared to be, a single object, and the units thereof, hereinafter described, collectively constitute, . . . one project.  The construction, operation[,] and maintenance of said Central Valley Project as herein provided for is hereby declared to be in all respects for the welfare and benefit of the people of the State, for the improvement of their prosperity and their living conditions . . . ."  (Stats. 1933, ch. 1042, § 3, pp. 2643-2644.)

The CVP Act defined the Central Valley Project system as comprised of six features, which it refers to as "units."  As proposed, the key features of the project included a Kennett (now Shasta) Dam to store and regulate water from the Sacramento River, and a Friant Dam to store and regulate water from the San Joaquin River.  (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 99 (*Racanelli*); Stats. 1933, ch. 1042, § 4, pp. 2643-2646.)  The other "units" described in the CVP Act consisted of conduits or canals and other works necessary to transfer water from the Sacramento-San Joaquin Delta (the Delta)[5] to the San Francisco Bay Area or southern

---

[5]     Formed by the confluence of the State's two largest rivers, the Delta is a critically important estuary and wetland ecosystem.  (*Department of Water Resources Environmental Impact Cases* (2022) 79 Cal.App.5th 556, 564-565 (*Environmental Impact Cases*).)  It provides habitat for a vast array of aquatic and terrestrial species, offers a

San Joaquin Valley.  (Stats. 1933, ch. 1042, § 4, pp. 2643-2646.)  In addition, section 4 of the CVP Act stated that the project shall include "[s]uch other units as may be from time to time added" by the Water Project Authority (DWR's predecessor) "in furtherance of the single object contemplated by section 3 of [the] act."  (Stats. 1933, ch. 1042, § 4, pp. 2643-2646.)

As originally proposed, construction of the Central Valley Project was to be a state-funded project financed primarily with revenue bonds, to be repaid with revenues generated by the sale of water and hydroelectric power.  (*Goodman v. County of Riverside* (1983) 140 Cal.App.3d 900, 909, fn. 6; Stats. 1933, ch. 1042, §§ 6-9, 15-19, pp. 2643-2648, 2654-2657.)  The CVP Act authorized the issuance of revenue bonds in an amount not to exceed one hundred seventy million dollars for the purpose of defraying the cost of constructing the project.  (Stats. 1933, ch. 1042, p. 2643, § 18, pp. 2656-2657.)  However, amid the Great Depression, the state was unable to market the bonds, so the federal government took control of the project and began construction.  (*Westlands Water Dist. v. United States* (E.D.Cal. 2001) 153 F.Supp.2d 1133, 1142; *Racanelli, supra*, 182 Cal.App.3d at p. 99.)

Today, the Central Valley Project is one of the world's most extensive water transport systems, encompassing more than 20 dams and reservoirs and 500 miles of major canals.  (*Racanelli, supra*, 182 Cal.App.3d at p. 99; *Tehama-Colusa Canal Authority v. United States DOI* (E.D.Cal. 2011) 819 F.Supp.2d 956, 967; *San Luis & Delta-Mendota Water Authority v. United States* (9th Cir. 2012) 672 F.3d 676, 682.)  With a total storage capacity of more than 12 million acre-feet of water, the Central Valley

___

variety of recreational activities, and is home to more than half a million people.  (*Id*. at p. 565; *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1032.)  The Delta also serves as the hub for both of California's two major water supply systems:  The federal Central Valley Project and California's State Water Project.  (*Environmental Impact Cases,* at p. 565.)  "More than two-thirds of California residents (approximately 27 million people) and millions of acres of farmland rely on water diverted from the Delta watershed."  (*Delta Stewardship Council Cases,* at p. 1033.)

Project delivers approximately seven million acre-feet of water annually to over 250 water contractors, primarily for agricultural use in the Central Valley. (*Northern California Water Assn. v. State Water Resources Control Bd.* (2018) 20 Cal.App.5th 1204, 1231.)

Although the facilities built by the federal government differ in certain respects from those described in the CVP Act, the basic structure is the same. In general, water in the northern Central Valley is impounded and stored at Shasta Lake (and other reservoirs) and then periodically released into the Sacramento River to augment flows through the Delta.[6] There, the water is transported/channeled to the Tracy Pumping Plant, which lifts it into the Delta Mendota Canal, which channels the water along the west side of the San Joaquin Valley for use in the San Luis Unit and Reservoir, before eventually emptying into the San Joaquin River near the city of Mendota. (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 841, fn. 9; *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 692.) Another major feature of the Central Valley Project is the impound of San Joaquin River water at Friant Dam and the transportation of that water, via the Friant-Kern and Madera Canals, to contractors in the San Joaquin Valley. (*Racanelli, supra*, 182 Cal.App.3d at p. 99; *Westlands Water Dist. v. Patterson* (E.D.Cal. 1994) 864 F.Supp. 1536, 1539.)

### 2. *Codification of the California Water Code*

In 1943, California codified its water laws in a newly established Water Code. (*California Water Curtailment Cases* (2022) 83 Cal.App.5th 164, 189; Stats. 1943, ch. 368, p. 1604.) In so doing, the Legislature declared that "[t]he provisions of this code, in so far as they are substantially the same as existing statutory provisions relating

---

[6]  Some water also is diverted from the Red Bluff Diversion Dam to the Tehama-Colusa and Corning Canals. (See *Pacific Coast Federation of Fishermen's Associations v. Gutierrez* (E.D.Cal. 2008) 606 F.Supp.2d 1195, 1231.)

to the same subject matter, shall be construed as restatements and continuations thereof, and not as new enactments." (Stats. 1943, ch. 368, p. 1604; see *California Water Curtailment Cases,* at p. 189.)

The provisions of the CVP Act were codified in Division 6 of Part 3 (§ 11100 et seq.) of the Water Code. (Stats. 1943, ch. 368, pp. 1604, 1743 et seq.; see, e.g., §§ 11125-11127, 11200-11290, 11700-11784.) Except as discussed below, the relevant provisions of the CVP Act have remained substantially the same since they were codified in 1943.

Section 11201 et seq. describes the authorized units of the Central Valley Project. They include the Shasta Dam, Contra Costa Conduit, San Joaquin Pumping System, Friant Dam, Madera Canal, Friant-Kern Canal, Tehama-Colusa Conduit, and Tehama-Butte Conduit.[7] (§§ 11205-11251; see Stats. 1943, ch. 368, pp. 1604-1748; Stats. 1941, ch. 701, § 1, pp. 2215-2217.)

Section 11290 provides that the project also shall include "such other units as may be from time to time added by [DWR] to the units specifically enumerated." It states that "[DWR] may add additional units which are consistent with and which may be constructed, maintained, and operated as a part of the project and in furtherance of the single object contemplated by this part." (§ 11290; Stats. 1943, ch. 368, pp. 1604-1749.)

Section 11700 codified DWR's authority to issue bonds to finance the construction of Central Valley Project units. As amended, it provides that DWR "may, from time to time, issue bonds" for the purpose of "providing money and funds to pay the cost and expense of carrying out any of the objects and purposes" of the CVP Act. (§ 11700.) The bonds authorized by the CVP Act are "revenue bonds," to be secured solely by revenues received from the use or operation of the project. (§ 11720; see §§ 11721, 11722.) The bonds "shall not constitute or be a debt, liability, or obligation of the State" or its general fund. (§ 11721.)

---

[7] The Legislature subsequently added other units to the project. (See, e.g., § 11252.)

11

### 3. *The Feather River Project*

After World War II, California experienced a period of tremendous population growth, prompting concerns about the adequacy of California's water supplies and flood control protection. (Towner, *The Role of the State* (1957) 45 Cal. L.Rev. 725, 728.) The Legislature responded to these concerns in 1945 by creating a water resources board and directing it to conduct a comprehensive investigation of the water resources of California. (O'Connor, Cal. Research Bur., Issue Summary: Financing the State Water Project (June 1994), p. B4 (O'Connor); Stats. 1945, ch. 1514, pp. 2827-2830, 2832.) The water resources board's work culminated in a master plan for the conservation, distribution, and utilization of California's water resources called the "California Water Plan." (O'Connor, *supra*, at p. B4; § 10004 et seq.)

In 1951, to further the purposes of the California Water Plan, the water resources board and State Department of Public Works Division of Water Resources (Division of Water Resources) prepared a report (State Water Resources Board and State Department of Public Works Division of Water Resources, Report on Feasibility of Feather River Project and Sacramento-San Joaquin Delta Diversion Projects Proposed as Features of the California Water Plan, (May 1951)) (the 1951 Report) on a specific water development proposal designated as the "Feather River and Sacramento-San Joaquin Delta Diversion Projects" (hereafter, the Feather River Project). (O'Connor, *supra*, at p. B4.) The Feather River Project proposed a multi-purpose dam and reservoir on the Feather River near Oroville (complete with a hydroelectric power plant and afterbay); a "Delta Cross Channel" to carry water from the Sacramento River to the Delta; an aqueduct to transport water from the Delta to Alameda and Santa Clara Counties; and another aqueduct to transport water from the Delta to the San Joaquin Valley and Southern California. (O'Connor, at pp. B4-B5.) The stated objectives of the project were to increase flood protection, produce hydroelectric power, control salinity, preserve fish

and wildlife, and "firm" the supply of water in the Delta for export to areas in the west and south.

Based on the 1951 Report, the Legislature authorized construction of the Feather River Project as a separate, state-operated "unit" of the Central Valley Project. (§§ 11200, 11260; Stats. 1951, ch. 1441, pp. 3401-3402; *Racanelli, supra*, 182 Cal.App.3d at p. 100.)  The features of the Feather River Project were not described in the statute (§ 11260).  (Stats. 1951, ch. 1441, p. 3401.)  Instead, the Legislature identified the project's features by reference to the facilities described in the 1951 Report. (*Ibid.*)  However, recognizing that the project described in the 1951 Report was not final, the Legislature authorized DWR to make "modifications" to such facilities.  (§ 11260.)

In 1955, the Division of Water Resources submitted an updated report on the Feather River Project (State of California Department of Public Works, Division of Water Resources, Program for Financing and Constructing the Feather River Project as the Initial Unit of the California Water Plan (Feb. 1955)) (the 1955 Report), which made modifications to the facilities described in the 1951 Report.  Among other things, the 1955 Report modified the project to include the San Luis Reservoir on the west side of the San Joaquin Valley.  It also discussed changes to the Oroville Dam and Power Plant and to the proposed route for the Feather River Project Aqueduct.  The Legislature subsequently incorporated these changes into section 11260.  (Stats. 1956 1st Ex. Sess., ch. 54, § 1, p. 429.)

In 1959, DWR (as successor to the Division of Water Resources) submitted a third update on the Feather River Project (State of California Department of Water Resources, Feather River and Delta Diversion Projects Preliminary Summary Report on Investigation of Alternative Aqueduct Systems to Serve Southern California (Feb. 1959)) (the 1959 Report), which further considered the routes by which surplus Delta water would be delivered to Southern California.  In 1959, the Legislature also incorporated this report into section 11260.  (Stats. 1959, ch. 2043, p. 4723.)

13

As amended, section 11260 describes the authorized Feather River Project facilities by reference to all three reports. Specifically, it provides: "The units set forth in [the 1951 Report], as modified in the [1955 Report], . . . and as further modified by the recommendations contained in [the 1959 Report], and subject to such further modifications thereof as [DWR] may adopt, . . . may be constructed by the department and maintained and operated by it to such extent and for such period as the department may determine, as units of the Central Valley Project separate and apart from any or all other units thereof." (§ 11260)

The features described as the Feather River Project in the 1951, 1955, and 1959 Reports comprise the initial unit of the statewide water storage and delivery system known as the State Water Project. (*State Water Resources Control Bd. Cases, supra*, 136 Cal.App.4th at p. 693; *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1154.) The Legislature has, from time-to-time authorized other units to be constructed, maintained, and operated as part of the State Water Project or federal Central Valley Project. For example, in 1957, the Legislature amended sections 11200 and 11270 to authorize the North Bay Aqueduct as an additional unit of the State Water Project. (Stats. 1957, ch. 2252, §§1-3, pp. 3917-3918; see also Stats. 1959, ch. 1750, §§1-3, pp. 4212-4213 [Hogan Dam], Stats. 1959, ch. 1774, §§1-3, pp. 4258-4259 [Black Butte Dam and Reservoir].)

4.      *The Burns-Porter Act and State Water Contracts*

Although the Feather River Project was initially authorized in 1951, it was not until almost a decade later that the Legislature enacted the legislation necessary to begin meaningful construction on the project. (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1155.)

In 1959, the Legislature enacted the California Water Resources Development Bond Act (the Burns-Porter Act) (§ 12930 et seq.), which—after voter ratification—authorized the issuance of $1.75 billion in general obligation bonds (§§ 12935-12936) to

14

provide funding for the State Water Project. (*Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1174; §§ 12931, 12934, subd. (d).)

As specified in the Burns-Porter Act, the object of the legislation was to "provide funds to assist in the construction of a State Water Resources Development System." (§ 12931.) Section 12931 defines such system as being comprised of: (1) the "State Water Facilities" as defined in subdivision (d) of section 12934; (2) "such additional facilities as may now or hereafter be authorized by the Legislature" as a part of the Central Valley Project or California Water Plan; and (3) "such other additional facilities as [DWR] deems necessary and desirable to meet local needs, including, but not restricted to, flood control, and to augment the supplies of water in the Sacramento-San Joaquin Delta and for which funds are appropriated pursuant to this chapter." (§ 12931; *Metropolitan Water Dist. of Southern Cal. v. Marquardt* (1963) 59 Cal.2d 159, 172.)

Section 12934, subdivision (d), in turn, defines the term " 'State Water Facilities' " by referring to the facilities authorized by section 11260 of the CVP Act, including the Oroville Dam and related dams and reservoirs; "[f]acilities for the generation and transmission of electrical energy;" and an "aqueduct system" which will transport water from the Delta to the west and south. (§ 12934, subd. (d)(2), (5).)

Although the bonds issued under the Burns-Porter Act are general obligation bonds backed by the State, revenue anticipated from the sale of water and power made available by the State Water Project is pledged for payment of principal and interest on the bonds. (61 Ops. Cal. Atty. Gen. 373 (1978); §§ 11454-11455, 11625, 12936-12937.) To generate such revenue, the Burns-Porter Act directs DWR to enter into contracts for the sale, delivery, or use of water and power. (§ 12937, subd. (b).) DWR currently has long-term contracts with 29 local government contractors. (*Planning & Conservation, supra*, 98 Cal.App.5th at p. 742.)

15

"Under the contracts, each contractor has participation rights in the State Water Project, including the right to receive a certain portion of available State Water Project supplies. 'The amount of water available depends on rainfall, snowpack, runoff, reservoir capacity, pumping capacity, and regulatory and environmental restrictions.' [Citation.] In return for those rights, the contractors pay a proportional share of the costs of developing, operating, and maintaining the State Water Project regardless of the amount of water they receive. [Citation.] The contractors that receive water also make payments attributable to the amount [of water] received. [Citation.] These contractor payments pay for both project operating costs and the public bonds issued to build the system." (*Planning & Conservation*, *supra*, 98 Cal.App.5th at pp. 742-743.)

Section 12937 of the Burns-Porter Act provides that state water contracts are entered into for the direct benefit of the holders of the bonds; the income and revenues derived from such contracts are pledged to the purposes of the act; and the contracts shall not be impaired by subsequent acts of the Legislature so long as any authorized bonds are outstanding. (§ 12937, subd. (b).) The act also provides that all revenues generated by the system are declared to constitute a "trust fund" and are pledged for the following purposes in the following priority: (1) payment of the reasonable costs of the annual maintenance and operation of the system itself; (2) payment of the principal and interest on the bonds issued under the act; (3) transfer to the California Water Fund as reimbursement for funds utilized for construction of the [State Water Project]; and (4) any surplus revenues "shall . . . be deposited in a special account in the California Water Resources Development Bond Fund and . . . available for expenditure by [DWR] for acquisition and construction of the [State Water Project]." (§ 12937, subd. (b); *Goodman v. County of Riverside, supra*, 140 Cal.App.3d at p. 911.) Thus, payments received from state water contractors are irrevocably pledged for the purposes of running the State Water Project and paying any outstanding Burns-Porter Act bonds. (61 Ops. Cal. Atty. Gen. 373 (1978); *Warne v. Harkness* (1963) 60 Cal.2d 579, 584.)

16

Notably, the pledge and priority provisions of the Burns-Porter Act did not repeal the provisions of the CVP Act authorizing the issuance of revenue bonds and the pledging of revenues for the payment of such bonds. (*Warne v. Harkness, supra*, 60 Cal.2d at pp. 584-585, 588.) The Burns-Porter Act "expressly continues, rather than precludes, the operation of the [CVP Act]." (*Warne,* at pp. 584-585.) It declares that any facilities financed under the act "shall be acquired, constructed, operated, and maintained pursuant to the provisions of the [CVP Act]." (§ 12931.) Citing this language, the California Supreme Court rejected a claim that DWR's authority to issue revenue bonds under the CVP Act was terminated by the Burns-Porter Act. (*Warne,* at p. 585.) Instead, the California Supreme Court ruled that "the two acts can and should be reconciled by construing the pledge and priority provisions of the Burns-Porter Act as applying to revenues from facilities constructed with funds made available under that act but as having no application to revenues from facilities financed under the [CVP Act]." (*Id*. at pp. 585, 589-590.) In other words, revenues from facilities financed with CVP Act bonds are removed from the operation of the pledge and priority provisions of the Burns-Porter Act. Accordingly, construction of State Water Project facilities has proceeded under both the CVP Act and the Burns-Porter Act. (*Planning & Conservation, supra*, 98 Cal.App.5th at p. 742.)

Today, the State Water Project consists of a series of 21 dams and reservoirs, 5 power plants, and 16 pumping plants, which stretch from Lake Oroville in Butte County to Lake Perris in Riverside County. (*Planning & Conservation*, *supra*, 98 Cal.App.5th at p. 741.) Under the State Water Project, water stored behind Oroville Dam is released into the Sacramento River and flows to the Delta. In the Delta, a portion of the project water is diverted to the North and South Bay Aqueducts for delivery to the Bay Area. A greater portion of the project water is lifted by pumping plants into the California Aqueduct for transport to Central and Southern California. (*Racanelli, supra*, 182 Cal.App.3d at p. 100; *State Water Resources Control Bd. Cases, supra*, 136 Cal.App.4th at p. 693.)

### 5. *Delta Conveyance Facility Proposals*

One of the principal objectives of the State Water Project is to collect surplus water from "wet" areas in the north and transport it to "dry" areas in the west and south. The Delta, located on the western edge of the Central Valley, is critical in achieving this objective because it serves as a natural point of convergence for California's water delivery system. (*Delta Stewardship Council Cases, supra*, 48 Cal.App.5th at pp. 1031, 1033; §§ 85002, 85004.) Upon being released from the Oroville Dam, surplus water from Northern California is carried by river systems to the Delta, where it is controlled and diverted to aqueducts for delivery to other parts of the state. In this sense, the Delta estuary is used as a physical "pool" to supply the water needed for export to other areas.

To facilitate exports from the Delta, the original Feather River Project proposed the "Delta Cross Channel" facility, which was designed to "convey water flowing down the Sacramento River to the westerly channels of the San Joaquin Delta." The proposed Delta Cross Channel was never constructed, however.

In 1959, when the Burns-Porter Act was enacted, the Legislature did not include the Delta Cross Channel in its description of the authorized "State Water Facilities." Instead, the Legislature described the prospective Delta features more broadly as "[m]aster levees, control structures, channel improvements, and appurtenant facilities in the Sacramento-San Joaquin Delta for water conservation, water supply . . . , transfer of water across the Delta, flood and salinity control, and related functions." (§ 12934, subd. (d)(3).) At the time, DWR "had not developed a construction plan for [any] Delta facilities."

In 1960, shortly after voters ratified the Burns-Porter Act, DWR published a report evaluating potential Delta facilities. (Department of Water Resources, Bulletin No. 76, Report to the California State Legislature on the Delta Water Facilities as an Integral Feature of the State Water Resources Development System (Dec. 1960).) The report stated that the objectives of the proposed Delta facilities were to provide adequate water

18

supplies throughout the Delta, transport water across the Delta without undue loss or deterioration in quality, provide flood and seepage control to Delta islands, provide improved vehicular transportation access, and minimize effects on existing recreation development and enhance recreation growth.  The report evaluated four options:  (1) a Chipps Island Barrier Project, which would involve a floodway structure, fishway, and navigation locks near the city of Pittsburgh; (2) a Single Purpose Delta Water Project, which would direct virtually all Sacramento River flows down Georgiana Slough and the Mokelumne River; (3) a Typical Alternative Delta Water Project, which would be a variation of option two with additional flood protection along the Mokelumne River; and (4) a Comprehensive Delta Water Project, which would be a variation of option three with additional flood protection along Old River.  The report recommended the Single Purpose Delta Water Project be adopted as a feature of the State Water Project, but that recommendation was not accepted.  Consequently, in 1961, DWR, the United States Bureau of Reclamation (the Bureau), and the United States Army Corps of Engineers formed an Interagency Delta Study Committee to formulate a "mutually acceptable plan of improvement."

In 1963, the Bureau introduced to the Interagency Delta Study Committee the concept of a "Peripheral Canal" as an "alternative" project.  The proposed Peripheral Canal consisted of a 43-mile-long isolated canal that would divert water from the Sacramento River near Hood and convey it to the Clifton Court Forebay, near the Tracy pumping plant.  (*Planning & Conservation*, *supra*, 98 Cal.App.5th at p. 746.)  In 1966, DWR adopted Project Order No. 12, Peripheral Canal (Mar. 1966), designating the Peripheral Canal as a State Water Project facility.

Initially, California sought to build the Peripheral Canal on a cooperative basis with the Bureau.  However, unable to secure Congressional authorization, DWR decided to move forward with the canal as a state-only project.  The Legislature passed an act authorizing the construction of the Peripheral Canal in 1980, but the legislation was

19

short-lived.  In 1982, voters rejected the Peripheral Canal in a referendum election.  (*Planning & Conservation, supra*, 98 Cal.App.5th at p. 746.)

After the Peripheral Canal's defeat, DWR temporarily shifted its focus back to "through-Delta" water transfer facilities, investigating options such as the "New Hope Cross Channel-South Delta Intake Channel," "New Hope Cross Channel-Enlarged Clifton Court Forebay," and "Enlarged North Delta Channels-Enlarged Clifton Court Forebay."

In 2006, DWR began working on a proposal known as the Bay Delta Conservation Plan, which consisted of a new isolated conveyance facility plus a long-term habitat conservation plan for the greater Delta.  (*Environmental Impact Cases, supra*, 79 Cal.App.5th at pp. 565-566.)  The new conveyance facility would consist of two tunnels designed to divert water from the Sacramento River in the north Delta and convey it approximately 35 miles to the south Delta near the existing pumps.  (*Ibid*.)  "The 'twin tunnels' were not intended to replace the existing through-Delta conveyance system, but to instead create a second facility that could be operated in conjunction with existing facilities, adding flexibility and resiliency to the water supply system."  (*Id*. at p. 566.)

In 2013, DWR and the Bureau (among others) issued a draft Environmental Impact Report (EIR) for the Bay Delta Conservation Plan (CEQA; Cal. Code Regs., tit. 14, § 15000 et seq.).  (*Environmental Impact Cases, supra*, 79 Cal.App.5th at p. 566.)  In 2015, in response to comments on the draft EIR, DWR altered the project, replacing the proposed Bay Delta Conservation Plan with the alternative "WaterFix" project.  (*Ibid*.)  Although the proposed water conveyance facilities were essentially unchanged, the new California WaterFix project decoupled the conservation plan elements.  (*Ibid*.)

In July 2015, DWR issued a partially recirculated draft EIR for the revised project.  (*Environmental Impact Cases, supra*, 79 Cal.App.5th at p. 566.)  "Notably, a single tunnel conveyance was included among the alternatives analyzed . . . in the EIR."  (*Ibid*.)

In July 2017, DWR certified a final EIR, approved the California WaterFix project, and adopted resolutions authorizing revenue bond financing.  (*Ibid.*)

In August 2017, lawsuits were filed challenging the California WaterFix project. (*Environmental Impact Cases, supra*, 79 Cal.App.5th at p. 567.)  "Although the allegations vary, in general, the lawsuits alleged that [DWR] violated CEQA by failing to adequately and accurately describe the project; defining project objectives too narrowly; using an improper baseline; piecemealing the environmental analysis; failing to adequately identify, analyze, and mitigate the project's impacts (especially to water quality and hydrology); failing to consider a reasonable range of alternatives; failing to recirculate the final EIR; failing to adequately consult with stakeholders and meaningly respond to public comments; and adopting findings that are not supported by substantial evidence.  [The plaintiffs] also alleged violations of the Sacramento-San Joaquin Delta Reform Act of 2009 (§ 85000 et seq.), the public trust doctrine, and the California Endangered Species Act.  (Fish & G. Code, § 2050 et seq.)"  (*Ibid.*)

In 2019, while the lawsuits were pending, California's newly elected Governor announced that he did not support the California WaterFix project's dual tunnel proposal and directed DWR to instead pursue a single tunnel conveyance.  (*Environmental Impact Cases, supra*, 79 Cal.App.5th at p. 564.)  Following that announcement, DWR decertified the California WaterFix EIR, vacated its findings, and rescinded the associated project approvals.  (*Id.* at p. 568.)  Less than a week later, DWR rescinded the resolutions authorizing revenue bond financing for the California WaterFix project.  (*Ibid.*)  As a result, the lawsuits were dismissed.  (*Id.* at p. 569.)

      6.    *The Proposed "Delta Conveyance Project"*

In January 2020, DWR published a Notice of Preparation of an EIR for an isolated single tunnel "Delta Conveyance Project" (hereafter, the Conveyance Project). (Department of Water Resources, Notice of Preparation, Notice of Preparation of Environmental Impact Report for the Delta Conveyance Project (Jan. 15, 2020).)  As

described in the Notice of Preparation, the fundamental purpose of the Conveyance Project is to "restore and protect" the reliability of State Water Project (and potentially Central Valley Project) water deliveries south of the Delta. The Conveyance Project is also intended to achieve the following objectives: address the foreseeable consequences of climate change and extreme weather events; minimize water supply disruption due to seismic events; protect the ability to deliver water when hydrologic conditions permit, consistent with the requirements of state and federal law; and provide operational flexibility to improve aquatic conditions in the Delta.

As proposed, the Conveyance Project would divert up to 6,000 cubic feet per second of water from the Sacramento River in the north Delta and convey it (approximately 42 miles) in tunnels and shafts to pump facilities in the south Delta. The Notice of Preparation states that the new conveyance facilities would be used to increase DWR's ability to capture water during high flow events, while complying with all state and federal regulatory requirements necessary to protect biological resources and beneficial uses. The Notice of Preparation states that construction of the Conveyance Project, if approved, would take approximately 13 years and would include new intake facilities on the Sacramento River, connecting tunnels and shafts, forebays, a pumping plant, and south Delta conveyance facilities that would extend to the existing State Water Project pumping plant. Implementation of the Conveyance Project also "may involve" modifications to one or more of the existing state water contracts.

In connection with the proposed Conveyance Project, DWR entered into an (amended and restated) joint exercise of powers agreement with several state water contractors to manage the design and construction of the Conveyance Project. DWR also began negotiating state water contract amendments addressing cost and water management issues related to the Conveyance Project, including planning and environmental review costs.

In 2022, DWR issued a draft EIR for the Conveyance Project. In 2023, DWR issued its final EIR.[8] In addition to the proposed project (and a "no project" option), the final EIR analyzed eight alternative projects. Every alternative proposed a conveyance facility that would operate in conjunction with the existing south Delta export facilities to create a "dual conveyance" system. (Italics omitted.)

PROCEDURAL BACKGROUND

B.     *The Bond Resolutions*

In August 2020, DWR adopted the Delta Program General Bond Resolution (State of California Department of Water Resources, Delta Program Revenue Bond General Bond Resolution, No. DWR-DPRB-1, (Aug. 6, 2020)), the First Supplemental Resolution (State of California Department of Water Resources, First Supplemental Resolution Providing for the Issuance of Delta Program Revenue Bonds Series A, No DWR-DPRB-2, (Aug. 6, 2020)), and the Second Supplemental Resolution (State of California Department of Water Resources, Second Supplemental Resolution Providing for the Issuance of Delta Program Revenue Bonds Series B, No DWR-DPRB-3, (Aug. 6, 2020)) (collectively, the Bond Resolutions) authorizing "Delta Program Revenue Bonds" and establishing the terms and conditions under which DWR may issue such bonds. The Bond Resolutions generally authorize the issuance of revenue bonds to fund and/or reimburse (1) the costs of the environmental review, planning, engineering, and design of water conveyance facilities that may be proposed for approval as part of the "Delta Program," and (2) if such facilities are approved by DWR, the costs of acquiring and constructing those facilities.

The First and Second Supplemental Resolutions authorize the issuance of two series of revenue bonds for specified purposes. The First Supplemental Resolution authorizes the issuance of "Series A" bonds to pay for (or reimburse) the planning costs

_____

[8]     DWR's approval of the final EIR is the subject of separate litigation.

23

incurred before the acquisition and construction of any Delta Program facilities. The Second Supplemental Resolution authorizes the issuance of "Series B" bonds to pay or reimburse any "[c]apital [c]osts," including acquisition and construction costs, for Delta Program facilities.

The term "Delta Program" is defined in the Bond Resolutions as "facilities for the conveyance of water in, about and through the Sacramento-San Joaquin Delta, subject to such further specification thereof as [DWR] in its discretion may adopt." The Bond Resolutions further provide that "Delta Program facilities may include, but are not limited to, water diversion intake structures located on the Sacramento River and a tunnel to convey water to Banks Pumping Plant."

Section 802 of the Delta Program General Bond Resolution provides that payment of the bonds is secured by a first and direct charge and lien upon the "Revenues and all money and securities held, and accounts established, under [and subject to the terms and conditions of, the Bond Resolutions]." The term "Revenues" is defined to mean "all moneys received" by DWR: (1) "under the Water Supply Contracts resulting from the portion of the Delta Program the Capital Costs of which are paid or reimbursed with the proceeds of the Bonds or earnings from the investment of proceeds of the Bonds . . . " (2) "from any other legally available source which [DWR] in its discretion determines to be Revenues and so designates in a Certificate . . . filed with the Treasurer;" and (3) as "income from the deposit or investment of moneys held in the Revenue Fund pursuant to [the Bond Resolutions]." Section 805 Delta Program General Bond Resolution provides that DWR "shall charge and collect amounts under the Water Supply Contracts sufficient to return the costs of the Delta Program for which Bonds have been authenticated and delivered without regard to whether or not [DWR] is able to construct, acquire or operate any Delta Program facilities."

In connection with the approval of the Bond Resolutions, DWR staff prepared a memorandum explaining that while the Bond Resolutions would provide financing for

24

the proposed Conveyance Project, they would not commit DWR to approving that project or any other water conveyance facility. (Vinay Behl, Chief Div. of Fiscal Services, DWR, Spencer Kenner, Chief Counsel, DWR, mem. to Karla A. Nemeth, Director of DWR, July 30, 2020.) The staff memorandum also explains that adoption of the Bond Resolutions would not involve the " 'approval' " of a " 'project' " for purposes of CEQA and that any indirect environmental effects that may result are "too conceptual, diffuse, and speculative to allow for meaningful environmental review."

Regarding DWR's authority to adopt the Bond Resolutions, the staff memorandum suggests DWR is authorized to approve the Delta Program as "modifications" to the Feather River Project under section 11260 of the CVP Act. DWR did not adopt a project order modifying the Feather River Project to include the Conveyance Project or the Delta Program.

C.     *The Validation Action*

" '[S]tatutory validation actions are designed to provide expedient, uniform procedures by which public agencies can obtain binding judgments as to the validity of public financing commitments such as "bonds, warrants, contracts, obligations or evidence of indebtedness . . . .' [Citation.] 'They are expedited because they require validation proceedings to be filed within 60 days of the public agency's action (Code Civ. Proc., §§ 860, 863) [and] are "given preference over all other civil actions" (*id*., § 867).' [Citation.] 'They are definitive because they are in rem proceedings that . . . result in a judgment that is "binding . . . against the world" [citations], and cannot be collaterally attacked, even on constitutional grounds.' " (*Westlands Water Dist. v. All Persons Interested* (2023) 95 Cal.App.5th 98, 124; see *California Commerce Casino, Inc. v. Schwarzenegger* (2007) 146 Cal.App.4th 1406, 1420-1421; *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 843; Code Civ. Proc., §§ 860, 864; Gov. Code, § 17700.)

DWR filed its validation complaint on August 6, 2020, seeking to validate its authority under sections 11260 and 11700 of the CVP Act to (1) adopt and approve the Bond Resolutions; (2) issue revenue bonds to pay and/or reimburse the costs to review, plan, design, and, if and when appropriate, acquire and construct, any water conveyance facilities proposed as part of the Delta Program; and (3) pledge revenues from the Delta Program to secure repayment of the bonds.

Several state water contractors filed answers in support of validation. Numerous other parties filed answers opposing validation. The opponents challenged the allegations of the complaint and raised affirmative defenses based on DWR's alleged failure to comply with CEQA, the Delta Reform Act, and other laws. Sierra Club also filed a petition for writ of mandate alleging that DWR's approval of the Bond Resolutions violated CEQA. The trial court subsequently consolidated the validation action and CEQA writ proceeding for all purposes, designating the CEQA proceeding as the lead case.

In December 2021, the trial court heard cross-motions for summary judgment and summary adjudication on the CEQA-related claims and affirmative defenses. In January 2022, the trial court denied the motions filed by the parties opposing validation, and granted DWR's cross-motions, ruling that DWR did not need to complete environmental review under CEQA before adopting the Bond Resolutions. Sierra Club, moved for a new trial and for reconsideration of the January 2022 ruling. The trial court denied the new trial motion, granted reconsideration, and reaffirmed its ruling in favor of DWR

North Coast Rivers Alliance, and DWR subsequently filed cross-motions for summary judgment on the affirmative defenses related to alleged violations of the Delta Reform Act and public trust doctrine. In addition, Howard Jarvis Taxpayers Association filed a motion for summary adjudication relating to whether the bonds proposed for the Delta Program constitute pre-Proposition 13 (Cal. Const. art. XIII A, as approved by voters, Primary Elec. (June 6, 1978) voter-approved indebtedness and whether local

agencies would have authority to pay for the bonds by overriding Proposition 13's one percent cap on property taxes. The trial court denied the motions filed by North Coast Rivers Alliance and Howard Jarvis Taxpayers Association and granted DWR's cross-motion.

The remaining validation issues proceeded to a bench trial conducted from May 15, 2023, through May 8, 2023. On August 25, 2023, the trial court issued its tentative decision, concluding that DWR exceeded its delegated authority under the CVP Act when it adopted the Bond Resolutions.

On January 16, 2024, the trial court affirmed its tentative decision and issued a final statement of decision. The same day, the court entered a judgment dismissing the CEQA petition and denying validation. This appeal followed.

REQUESTS FOR JUDICIAL NOTICE

Respondents Sierra Club, has filed a request for judicial notice of select pages of the December 21, 2023, Executive Summary and final EIR for the Conveyance Project. Appellants have requested judicial notice of DWR's, Management of the California State Water Project, Bulletin 132-2021, July 2024, Chapters 1 and 2. We grant both requests. (Evid. Code, § 452, subds. (c) & (h).)

DISCUSSION

I

*Validation Action*

A.    *Arguments of the Parties*

As discussed, section 11700 of the CVP Act authorizes DWR to issue revenue bonds "[f]or the purpose of providing money and funds to pay the cost and expense of carrying out any of the objects and purposes" of the act. Per section 11260, the objects and purposes of the CVP Act include the Feather River Project. The Feather River Project, in turn, is defined by the three reports referenced in section 11260, "subject to such further modifications thereof" as DWR may adopt. (§ 11260.) DWR relied on these

27

statutes in adopting the Bond Resolutions to authorize the issuance of bonds for the planning, review, and possible construction of the Delta Program.

The question presented in this appeal is whether the Delta Program, as defined in the Bond Resolutions, qualifies as a "further modification" of the Feather River Project, such that it falls within DWR's delegated authority under section 11260. (See *United Farm Workers of America v. Agricultural Labor Relations Bd.* (1995) 41 Cal.App.4th 303, 314 [an administrative agency is vested only with the powers expressly conferred by the Legislature and cannot exceed those powers].) In denying validation, the trial court reasoned that the Bond Resolutions were not within DWR's delegated authority because the definition of the Delta Program was overbroad and "untethered to the objectives, purposes, and effects of the Feather River Project unit" of the CVP Act.

Appellants argue that the trial court erred in concluding that DWR lacks authority to adopt the Bond Resolutions. Specifically, they contend that the trial court erred by construing the definition of the Delta Program in isolation and limiting DWR's "modification" authority to minor or incremental changes. Viewed in the context of the Bond Resolutions as a whole, appellants argue that the definition of the Delta Program— facilities that convey water "in, about and through" the Delta—necessarily has a definite and limited purpose, of moving water north to south for purposes of the State Water Project. So construed, appellants contend that the Delta Program is an authorized "modification" of the Feather River Project because *any* conveyance in, about, and through the Delta will serve the function and purpose of the Feather River Project to conserve surplus water in areas of abundance and convey such water to areas of deficiency in the southern and western parts of the state. Thus, contrary to the trial court's ruling, appellants argue that the Bond Resolutions fall squarely within its lawful authority under sections 11260 and 11700.

Further, to the extent there is any ambiguity in the definition of the Delta Program, appellants argue that the trial court failed to apply contract interpretation principles and

28

consider extrinsic evidence that conclusively establishes the meaning of the Delta Program and the purpose of the Bond Resolutions. Such extrinsic evidence includes that (1) the Feather River Project is a key part of the statewide system of water conservation and conveyance facilities designed to conserve water in northern areas for transfer and distribution to areas of deficiency in the south and west; (2) the revenues pledged toward repayment of the bonds derive from payments by state water contractors, so the proposed Delta Program must provide water/services for which the state water contractors are required to pay; (3) most of the state water contractors are located west and south of the Delta and would not pay for a modification to the State Water Project that did not move water to their service areas; (4) DWR has previously evaluated and proposed, as "modifications" to the Feather River Project, "alternative" facilities for conveying water from the north to south Delta, including the Peripheral Canal, California WaterFix, and the currently-proposed Conveyance Project; (5) in the trial court proceedings, the parties understood that the Delta Program was about moving water from the Sacramento River to the pumping stations in the south Delta.

Respondents, in opposition, argue that the Delta Program is too ill-defined to support validation. They argue that the language and history of section 11260 demonstrate that it was intended to grant DWR only limited discretion to approve modest modifications (based on physical or engineering conditions) to the features of the Feather River Project approved by the Legislature. Further, they contend any such modifications must be consistent with the Feather River Project's stated objective of "firm[ing]" the supply of surplus waters *in* the Delta. Since nothing in the Bond Resolutions would limit the use, direction, or purpose of waters conveyed by future Delta Program facilities, respondents argue it is impossible to ascertain whether the Delta Program facilities will be consistent with the features, scope, and purpose of the Feather River Project. Thus, the definition is too vague and uncertain to support validation.

29

B.  *Standard of Review*

The scope of DWR's authority to "modify" the Feather River Project under section 11260 and its application to the Delta Program presents a question of law, which we review de novo.  (*Jenkins v. County of Riverside* (2006) 138 Cal.App.4th 593, 604; *Arnold v. California Exposition and State Fair* (2004) 125 Cal.App.4th 498, 505.)

When interpreting a statute, our fundamental task is to determine the Legislature's intent so as to effectuate the purpose of the law.  (*Martinez v. Combs* (2010) 49 Cal.4th 35, 51.)  "In this search for what the Legislature meant, '[t]he statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context.  If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.  On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction.  In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.' " (*Ibid*.)

Consistent with section 11126, we "liberally construe" the provisions of the CVP Act to effectuate the purposes and objects of that act.

C.  *Analysis*

Here, we conclude that DWR's definition of the Delta Program exceeds the scope of its authority under section 11260.  Although section 11260 gives DWR authority to modify the Feather River Project unit, the statute does not give DWR authority to add or construct new "units" of the State Water Project.  Such authority is instead found in section 11290, which provides that DWR "may add additional units which are consistent with and which may be constructed, maintained, and operated as a part of the [Central Valley Project] . . . ."  (§ 11290.)

Crucially, appellants rely *not* on section 11290 as authority for the Delta Program,[9] but instead on section 11260. As a result, appellants must show that the Delta Program qualifies as a "further modification" to the existing Feather River Project unit. At minimum, this means the Delta Program must be tethered to the objectives, purposes, and effects of the Feather River Project. The problem here is that the contours of the Delta Program are so ill-defined that it is impossible to ascertain whether any future Delta Program facilities will serve the objectives, purposes, and effects of the Feather River Project, or instead constitute a new and different "unit" of the State Water Project. Thus, we will affirm the trial court's conclusion that the definition of the Delta Program is too vague and uncertain to support validation.

1.    *Section 11260*

We begin our analysis by examining the language of section 11260 in the context of the statutory scheme of which it is a part. This leads us to the following observations:

First, the CVP Act of 1933 established the "Central Valley Project" as a single integrated "project" consisting of multiple subsidiary "units." (See *United States v. Gerlach Live Stock Co.* (1950) 339 U.S. 725, 733; §§ 11104, 11125, 11200-11201.) It defined and prescribed the authorized "units" in section 4 of the act. (Stats. 1933, ch. 1042, § 4, pp. 2643-2646.) At the time, the authorized units included the Kennett (now Shasta) Dam, Friant Dam, Contra Costa Conduit, San Joaquin Pumping System, Madera Canal, and Friant-Kern Canal. (*Ibid*.) The CVP Act also empowered DWR's predecessor agency to "add additional units consistent with and which may be constructed, maintained and/or operated as a part of said Central Valley Project . . . in

_____

[9]    At the hearing on the merits, DWR explained that it was not relying on section 11290 because it would not be able to pledge revenues from a new "unit" to repayment of the revenue bonds.

furtherance of the single object contemplated by . . . [the CVP Act]." (Stats. 1933, ch. 1042, § 4, pp. 2644-2646.)

Second, with the enactment of the Water Code in 1943, the description of the Central Valley Project was codified in Chapter 2, Division 6, of Part 3 (§ 11200 et seq.). Importantly, each "unit" of the Central Valley Project was described in a separate article within that chapter. For example, article 4 (§ 11220) described the "San Joaquin Pumping System" unit,[10] (Stats. 1943, ch. 368, pp. 1604-1747), and article 2 (§§ 11205-11209) described the Shasta Dam unit. (Stats. 1943, ch. 368, pp. 1604-1747.) DWR's authority to "add additional units" was codified in article 10 (§ 11290).

Third, in 1951, the Legislature added article 9.5 to the CVP Act (§ 11260), designating the Feather River Project as an additional "unit" of the Central Valley Project *and* one that may be constructed, maintained, and operated by DWR "separate and apart" from the units of the federal Central Valley Project. (Stats. 1951, ch. 1441, § 2, p. 3401; *California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 429-430 & fn. 9; *Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources, supra*, 213 Cal.App.4th at p. 1197.) As amended in 1959, section 11260 describes the facilities which comprise the Feather River Project unit by reference to the 1951, 1955, and 1959 Reports, "subject to such further modifications thereof" as DWR may adopt. (§ 11260.)

Since DWR already had the authority to add new units under section 11290, it is evident the Legislature intended DWR's "further modifications" authority in section

---

[10] It provided: "The unit designated as the San Joaquin Pumping System consists of a channel or canal with all necessary dams, pumping plants, conduits, and other works which the [Department] determines to be necessary to convey a supply of water for irrigation and other beneficial uses from the lower Sacramento River into the San Joaquin Delta, and also adequate to convey and transport not less than 3,000 cubic feet of water per second from a point on the lower San Joaquin River southerly to the mouth of Fresno Slough." (Stats. 1943, ch. 368, pp. 1604-1747.)

11260 to be more circumscribed.  Exactly how much more circumscribed is subject to reasonable dispute.  On one hand, as the trial court explained, the commonly understood meaning of the word "modification" connotes a moderate or incremental change which "introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject-matter intact."  (Oxford English Dict. Online (2025) <https://www.oed.com/dictionary/modifi-cation_n?tab=meaning_and_use#36537263> [as of Dec. 29, 2025]; Webster's 3d New Internat. Dict. 1452 (1965) p. 798; see Black's Law Dict. (6th ed. 1990) p. 1004, col. 1; *Biden v. Nebraska* (2023) 600 U.S. 477, 494; *MCI Telecommunications Corp. v. AT&T Co.* (1994) 512 U.S. 218, 225; *Peralta v. Hispanic Business, Inc.* (9th Cir. 2005) 419 F.3d 1064, 1072.)  Under this view, the "further modifications" language grants DWR only limited discretion to approve minor modifications that would become necessary based on physical or engineering conditions encountered during construction.

On the other hand, appellants argue that the "further modification" authority must be construed in light of the expansive modifications to the Feather River Project previously approved by the Legislature and the broad authority delegated to DWR to carry out the CVP Act.  They contend this shows the Legislature intended DWR to have essentially plenary authority to determine what facilities are necessary to carry out the Feather River Project.

We deem it unnecessary to delve into the nuances of this question.  For purposes of this appeal, it is sufficient that we conclude (1) DWR's authority to make "further modifications" to the Feather River Project under section 11260 is not so broad as to permit DWR to add entirely new and different "units" to the State Water Project; and (2) at minimum, any "further modifications" must be consistent with the Feather River Project's features and tethered to its purposes, objectives, and effects.

We reach this conclusion based mainly on a comparison of the language in sections 11260 and 11290.  But we find additional support for our conclusion in other

33

sections of the CVP Act, namely those in which the Legislature gave DWR the authority to make "modifications" to other "units" of the Central Valley Project or State Water Project. For example, section 11270 (article 9.7), which approved the North Bay Aqueduct as an additional unit of the State Water Project, provides: "The unit of the North Bay Aqueduct as set forth in Bulletin No. 60 . . . , *subject to such modification thereof as the department may adopt*, . . . may be constructed by the department and maintained and operated by it . . . as a feature of the California Water Plan, and as a unit of the Central Valley Project, separate and apart from any or all other units thereof." (§ 11270, italics added; Stats. 1957, ch. 2252, § 2, pp. 3917-3918.) Likewise, section 11252 (article 9.1) provides: "The unit designated as Hogan Dam and Reservoir, substantially in accordance with the recommendations of the Chief of Engineers in House Document No. 545, 78th Congress, Second Session, . . . *subject to such further modifications thereof as the department may adopt*, . . . may be constructed, maintained, and operated separate and apart from any or all other units thereof." (§ 11252, italics added.) Further, section 11276 (article 9.9) provides: "Black Butte Dam and Reservoir, substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 649, 78th Congress, Second Session, . . . *subject to such modifications thereof as the department may adopt*, . . . may be constructed and operated separate and apart from any or all other units thereof." (§ 11276, italics added.) In each instance, the Legislature established a new "unit" as described in a referenced report or document, "subject to" modification by DWR. This demonstrates the Legislature's intent to limit DWR's "modifications" authority to the "unit" designated in that section.

Section 11260 uses the words "modifications thereof" to refer to the Feather River Project unit described in the three reports mentioned in the statute. It follows that, to support validation, DWR must show the Delta Program qualifies as a "further modification" to that unit. DWR lacks the authority to approve a new State Water Project "unit" under the guise of a "further modification" of the Feather River Project.

34

## 2.    *The Feather River Project*

Next, we consider what are the features, purposes, and objectives of the Feather River Project. As discussed, section 11260 does not itself describe the components of the project. (§ 11260.) Instead, the statute identifies the Feather River Project by reference to three reports issued in the 1950's. (*Ibid*.) As the trial court held, the reports describe the project in "two distinctly different fashions" in terms of its " 'major features' " and "its purposes and objectives."

There is no dispute concerning the original features of the Feather River Project. They include the Oroville Dam (with hydroelectric power plant and afterbay), a "Delta Cross Channel" to carry water from the Sacramento River to the Delta, the San Luis Reservoir and Forebay, Buena Vista Forebay, Quail Lake Afterbay, various pumping stations, and conveyance systems (including aqueducts and canals) to transport water from the Delta to the Bay Area and Southern California.

Appellants disagree, however, about the Feather River Project's purposes and objectives. Appellants argue that the Feather River Project has a single "primary purpose," which is the same as the State Water Project: to conserve surplus water in areas of abundance in the northern part of the state and convey it to areas of deficiency in the south and southwest of the state. In contrast, respondents contend that the Feather River Project has multiple objectives, which include: increasing flood protection, producing hydroelectric power, controlling salinity in the Delta, preserving fish and wildlife, and "firm[ing]" the supply of excess waters in the Delta available for export. Respondents contend the 1951, 1955, and 1959 Reports show the purpose of the Feather River Project is not simply to convey water from north to south, but also to stabilize and preserve the Delta estuary by boosting "through Delta" flows.

Respondents have the better argument. Even if we accept that water conservation and redistribution were a primary objective of the Feather River Project, the evidence shows that the project additionally was designed with the secondary objective of

35

preserving and increasing water flows through the Delta to control salinity, protect fish and wildlife, and "firm" the supply of surplus water available for export.

### 3. *The Delta Program Definition*

We conclude our analysis by inquiring whether the Delta Program, as defined by the Bond Resolutions, qualifies as a "further modification" to the Feather River Project, i.e., whether it is aligned with the Feather River Project's features and serves its same purposes, objectives, and effects.

As the trial court noted, the Delta Program definition consists of two sentences. "The first is worded broadly and generically. It does not identify any specific facilities to be modified, nor does it identify any specific public work to be constructed. In contrast, the second sentence refers to potential structures, but does so merely for illustrative purposes (i.e., the facilities 'may include'). [¶] [W]ith reference to the contemplated water conveyance facilities, the definition imposes no apparent limitations. It restricts neither the direction nor the purpose of the contemplated water conveyance. . . . [T]he definition would appear to confer on DWR nearly infinite authority as to the direction, purposes, and objectives of any water conveyance facilities, as they would be subject to 'further specification . . . as DWR may in its discretion adopt.' "

The trial court concluded that the definition renders the Bond Resolutions too vague and uncertain to support a validation judgment because it "leaves the door open" for DWR to approve water conveyance facilities wholly unrelated to the Feather River Project. We agree.

The Delta Program's scope is so opaque and ill-defined as to afford DWR nearly unlimited discretion to specify the facilities for which the bonds will be issued. There is nothing in the definition that restricts the use of the water, its direction, or its purpose. There is no requirement that Delta Program facilities even serve the broader purposes of the State Water Project. As long as the facility proposes to convey water in, about, and

36

through the Delta, the Bond Resolutions would give DWR authority to issue an unlimited amount of bonds to finance the work.[11]

Consequently, we agree with respondents that DWR exceeded its delegated authority when it adopted the Bond Resolutions. The mere fact that a Delta Program facility will convey water in, about, and through the Delta area is insufficient to demonstrate that the facility is a "further modification" of the Feather River Project. Validating the Bond Resolutions would essentially give DWR carte blanche to issue bonds for any Delta conveyance facility it may choose, irrespective of whether the facility has any connection to the Feather River Project, as defined.

Appellants argue that the meaning of the Delta Program must be construed in the context of the pledge to repay the bonds with revenues received under the state water contracts. They contend the pledge of revenues shows that the Delta Program facilities must serve the State Water Project purposes for which DWR can properly impose charges under the state water contracts. However, just because DWR intends to use revenue from the state water contracts to repay the bonds does not establish that DWR has the statutory authority to approve the Delta Program as a "further modification" of the Feather River Project. Moreover, the fact that the pledge of revenues was included in the Bond Resolutions says nothing about whether DWR had the authority to make that pledge in the first instance.[12] We note that multiple parties opposed to validation, including several state water contractors, challenged the lawfulness of the pledge of revenues.

---

[11]    Although the Delta Program definition uses the phrase "in, about *and* through" the Delta, the illustrative example given in the Bond Resolutions (of a tunnel from the Sacramento River to the Banks Pumping Plant) demonstrates that the water need not be conveyed "in" and "through" the Delta estuary itself to meet that definition.

[12]    As discussed, the pledge and priority provisions of the Burns-Porter Act apply to revenues from facilities constructed with funds made available under that act. (*Warne v. Harkness, supra*, 60 Cal.2d at p. 586.) All such revenues are declared to constitute a trust

37

Appellants additionally argue that by referring to section 11260 in the recitals to the Bond Resolutions, DWR "clearly" signaled that the Delta Program is intended to be a "further modification" of the Feather River Project.[13]  But this is circular reasoning. Citing section 11260 as authority does not ipso facto mean that any Delta Program conveyance will be a "further modification" of the Feather River Project.[14]  It simply begs the question of whether the Delta Program, as defined in the Bond Resolutions, comports with section 11260.

We likewise reject appellants' contention that the second sentence of the Delta Program definition—stating that the Delta Program facilities may include water diversion intake structures and a tunnel to convey water to the pumping plant—informs its meaning.  This "illustrative" language merely identifies potential facilities that DWR *may* consider in the future as part of the Delta Program; it does not delimit the scope of DWR's discretion.

Appellants additionally argue that the trial court erred by failing to consider extrinsic evidence establishing that the Delta Program is a lawful "further modification" of the Feather River Project.  However, absent an affirmative showing that the trial court failed to properly weigh the evidence that it was required to consider, we must presume that the trial court correctly performed its duties.  (*Election Integrity Project California, Inc. v. Lunn* (2025) 108 Cal.App.5th 443, 449; Evid. Code, § 664; see *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  In any event, appellants have failed to show

---

fund and are pledged for the purposes set forth in the Burns-Porter Act.  (*Warne,* at p. 585; § 12937, subd. (b).)

[13]     The Bond Resolutions recite that the "Delta Program shall be maintained and operated by the Department separate and apart from all other units of the Central Valley Project," but reach no conclusion about whether the conveyance facilities contemplated by the Delta Program are a "modification" of a Central Valley Project unit.

[14]     Indeed, in the trial court, DWR argued that "[s]ection 11260 itself imposes no standard or boundary on the Department's discretion . . . ."

38

that the cited extrinsic evidence establishes that the Delta Program is a "further modification" of the Feather River Project.

To begin, appellants cannot rely on the Delta Cross Channel to justify the Delta Program. As one of the original features of the Feather River Project, the Delta Cross Channel involved a proposal to excavate a new channel from the Sacramento River to Georgiana Slough, along with dredging existing channels, to transport water naturally, north to south, from the Sacramento River to the San Joaquin River delta. The Delta Cross Channel never contemplated a wholesale diversion of water around or under the Delta.[15] In contrast, there is no language in the Bond Resolutions limiting the direction, purposes, and objectives of the Delta Program facilities. The Bond Resolutions would give DWR nearly unfettered discretion to finance *any* Delta conveyance facility, even one that is completely unrelated to the Delta Cross Channel. Thus, the Delta Program cannot be justified as a "further modification" of the Delta Cross Channel.

For similar reasons, we find irrelevant DWR's history of evaluating "alternative" methods of moving water north to south through the Delta, such as the Peripheral Canal and the California WaterFix. Even if we assume DWR had the authority to adopt such conveyances as modifications of the Feather River Project and/or State Water Project[16]—

---

[15]   The Burns-Porter Act illustrates this point. In describing the features of the State Water Project, the act refers not to the Delta Cross Channel, but to "[m]aster levees, control structures, channel improvements, and appurtenant facilities in the Sacramento-San Joaquin Delta . . . ." (§ 12934, subd. (d)(3).) This supports the conclusion that the Delta diversion features contemplated by the Feather River Project consisted of Delta channel improvements and appurtenant facilities, not isolated conveyance facilities.

[16]   We acknowledge that DWR adopted project orders purporting to authorize the Peripheral Canal and California WaterFix as "modifications" of the Feather River Project and Central Valley Project, respectively, under section 11260. But DWR's authority to do so was never adjudicated, and while its interpretation of section 11260 is entitled to consideration and respect, it is not binding. (*Associated General Contractors of California, Inc. v. Department of Industrial Relations* (2025) 108 Cal.App.5th 243, 266.) "The court, not the agency, has final responsibility for interpreting the law." (*Ibid.*)

an issue we need not decide—this has no bearing on whether the nebulous Delta Program is a further modification of the Feather River Project. Stated differently, even if DWR had the authority to approve the Peripheral Canal and California WaterFix project proposals, this would not establish that DWR has the authority to approve *any* facility for the conveyance of water in, about, and through the Delta as a modification under section 11260.

Nor do we find it relevant that DWR already commenced CEQA review of a particular Delta Program facility (i.e., the Conveyance Project). Appellants did not seek validation of bond financing for the Conveyance Project or any specific Delta conveyance facility. Instead, appellants relied on the broadly worded Delta Program definition, which essentially gives DWR discretion to authorize bonds for any facilities conveying water in, about, and through the Delta, irrespective of its connection (if any) to the Feather River Project.

Finally, it is immaterial that some state water contractors have agreements with DWR to contribute to the costs of evaluating potential Delta conveyance facilities. The fact that some state water contractors may be willing to support the evaluation of new Delta conveyance facilities is not evidence that the Delta Program, as defined, constitutes a "further modification" of the Feather River Project within the meaning of section 11260.

In sum, we agree that DWR exceeded its delegated authority when it adopted the Bond Resolutions. Even liberally construing section 11260, DWR's authority to make "further modifications" to the Feather River Project is not so broad as to allow any Delta conveyance facility. At a minimum, any such "modification" must be aligned with the

Furthermore, the Legislature's adoption of a bill designating the Peripheral Canal as a new "unit" to the Central Valley Project undermines the argument that DWR had the power to authorize the Peripheral Canal without legislative approval under section 11260. (See also § 12251 [authorizing DWR to exercise powers under CVP Act to construct Feather River recreation project].)

40

Feather River Project's features and serve its purposes, objectives, and effects. The problem with the Delta Program's definition is that it is so amorphous that it is impossible to ascertain whether future Delta Program facilities will be consistent with the features, scope, and purpose of the Feather River Project as defined in section 11260. Or, as the trial court held, the definition of the Delta Program fails because it is "untethered to the objectives, purposes, and effects of the Feather River Project unit." Accordingly, we find the definition too opaque to support the requested validation judgment.

In addition, aside from the overly broad definition of the Delta Program, we share the concerns expressed by some respondents that a judgment validating these Bond Resolutions could improperly foreclose future challenges related to the bonds. For example, the Bond Resolutions pledge to repay the bonds using "Revenues," broadly defined to include not only monies received under state water contracts, but also monies received from "any other legally available source which [DWR] in its discretion determines to be Revenues . . . ." This is problematic because a judgment validating the Bond Resolutions could be construed as an adjudication that DWR has the discretion to determine what is (and what is not) a "legally" available source of revenues. No such determination can be made on the record before us.

Likewise, section 805 of the Bond Resolutions provides that DWR "shall charge and collect amounts under the Water Supply Contracts sufficient to return the costs of the Delta Program for which Bonds have been authenticated and delivered . . . ." A judgment validating this language could be construed as adjudicating the question of whether DWR has the contractual right to charge state water contractors for Delta Program capital costs. In the trial court, DWR conceded that this is a contentious issue and DWR sought to "tailor" the validation judgment to avoid it. But DWR's authority to charge state water contractors for the costs of the Delta Program—either under existing contracts or amended contracts—is an integral component of the bond financing arrangement. (See *Graydon v. Pasadena Redevelopment Agency* (1980) 104 Cal.App.3d 631, 645.)

41

Removing that issue from the scope of the validation judgment would mean that the primary method of repaying the bonds would remain unsettled and subject to challenge. Such a result is at odds with the purpose of the validation statutes. (See *Friedland v. City of Long Beach, supra*, 62 Cal.App.4th at p. 842.) We are not persuaded that the validation process can be conducted in such a piecemeal fashion. (*Katz v. Campbell Union High School Dist.* (2006) 144 Cal.App.4th 1024, 1032; *Westlands Water Dist. v. All Persons Interested, supra*, 95 Cal.App.5th at p. 126.)

For all these reasons, we conclude DWR has failed to meet its burden of demonstrating that the Delta Program is within the scope of its delegated authority under section 11260. Because DWR's authority to issue bonds to finance the Delta Program is derivative of its argument that the Delta Program is an authorized "modification" of the Feather River Project under section 11260, we affirm the trial court's decision to deny validation of the Bond Resolutions. In view of our holding, it is unnecessary to address the merits of Howard Jarvis Taxpayers Association's argument that the Bond Resolutions cannot be validated because the proposed bonds would violate the state debt limit set forth in article XVI, section 1 of the California Constitution.

## II

### *Cross-Appeals*

Respondents Sierra Club, North Coast River Alliance, Tulare Lake, and the Public Agencies cross-appeal from the trial court's orders denying respondents' motions for summary judgment/adjudication and granting DWR's cross-motions for summary judgment/adjudication, as to the claims and affirmative defenses involving CEQA, the Delta Reform Act, or the public trust doctrine.

Appellants argue that the cross-appeals should be dismissed as untimely because the respective notices of appeal were filed after the 30-day time limit in Code of Civil Procedure section 870, subdivision (b). If the appeals are not dismissed, appellants contend they should be denied on the merits.

In light of our decision to affirm the judgment denying validation of the Bond Resolutions, we need not and do not reach any of the issues relating to the cross-appeals, including the timeliness of the notices of appeal. (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 419 [an appellate court will not review questions that are moot and only of academic importance]; see *Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 842.)

## DISPOSITION

The judgment denying validation is affirmed. Respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


_____\s\_____ ,
Krause, J.


We concur:


_____\s\_____ ,
Duarte, Acting P. J.


_____\s\_____ ,
Renner, J.

43